IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL CASE NO.: 3:11-399-MJP |
| | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| | ) | |
| RICHARD FRANCIS SANFORD, | ) | |
| | ) | |
| DEFENDANT. | ) | |
| | ) | |

**MOTION AND SENTENCING MEMORANDUM IN SUPPORT OF VARIANCE FOR DEFENDANT RICHARD FRANCIS SANFORD**

The defendant, Richard Sanford, by and through his undersigned counsel, hereby moves for a variance from the guideline range calculated under the United States Sentencing Guidelines. The current advisory guideline range is greater than necessary to comply with the purposes of sentencing. The defendant respectfully submits this Memorandum in order to provide information to assist the Court in fashioning a sentence "sufficient but not greater than necessary" to achieve the statutory purposes of punishment, as required by 18 U.S.C. § 3553(a) in light of *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005).

**I.     INTRODUCTION**

Richard Sanford will appear for sentencing on July 22, 2011. While a presentence report in this case recommends a guideline range of 10 to 16 months, Richard Sanford maintains that a variance from the guideline range is appropriate. On the unique facts of this case, the advisory guideline is too harsh, is greater than necessary, and the goals of sentencing are satisfied by a sentence below the Guidelines. Richard Sanford simply asks that this Court consider all of the individual factors that make his case unique in crafting an appropriate sentence. The Guidelines

1

range does not adequately account for Richard Sanford's personal history, his family ties and other important sentencing factors. Most problematic, however, the Guidelines range in this case is greater than necessary to accomplish the sentencing purposes set forth in 18 U.S.C. § 3553(a)(2). Richard Sanford respectfully requests a variance to achieve a sentence more appropriate for him.

## II.     PERSONAL HISTORY OF RICHARD SANFORD

Richard Francis (Rick) Sanford was born on January 9, 1957 in Rock Hill, SC to Johnny P. Sanford and Mary F. Sanford. Rick's father died last year, but his mother, who is 80 years old, still resides in Rick's childhood home in Rock Hill. Rick is the middle child of three children. He has an older brother, Steve, and a younger sister, Christie.

Rick's father worked at Bowater Carolina Corporation in Catawba, SC for 34 years. He had a demanding and dangerous job as a pulp dryer operator, constantly swinging shifts. Rick's mother worked as a secretary at Celanese Corporation and M. Lowenstein Corporation in Rock Hill. She then worked for Family Court in York County for 12 years, collecting child support payments. Both parents worked extremely hard to provide for their children. Mary Sanford says, "Johnny and I made sure that the children had the essentials, but we could never afford anything extra". Rick's mother made sure that the children were raised in a Christian environment, and they attended church with her every Sunday. Rick remains very close to his mother and drives to Rock Hill to take her to her doctor's appointments. He is a loving and attentive son. Although Rick has siblings, he is the one who manages his mother's medical needs.

As a child, Rick displayed outstanding athletic ability and spent most of his youth involved in sports. He spent most summer days at the YMCA in Rock Hill playing ball all day. By the time he was in high school at Northwestern High in Rock Hill, he had become an

2

outstanding athlete. He excelled in football, basketball, baseball and track and field. He lettered in football, basketball and track and field each year of his high school career, earning a total of 12 varsity letters.

Rick was named a high school All-American in basketball by Letterman Magazine in 1975, and was honored to be named one of their "super 60" national prospects that year. Rick was named to the SC All-State teams in football, basketball and track and field in 1975. The Charlotte Observer selected him as SC's high school Athlete of the Year in 1975.

Rick's most meaningful accomplishment in high school was his selection to the South Carolina Shrine Bowl football team in 1974. He was elected co-captain by his teammates. Rick says, "One of the highlights of my life was not only playing in the game, but having the opportunity to visit the children at Shriners Hospital in Greenville, SC. I was so moved and inspired by their positive, hopeful outlook, despite their burns and other disabilities. I was proud to know that in some small way, I was helping them."

Rick played American Legion baseball during the summers in high school. The St. Louis Cardinals major league baseball organization wanted to draft Rick after high school graduation, but it was important to Rick's parents that he receive a college education. When Rick graduated from Northwestern High in 1975 he received full scholarship offers to over 100 universities to play basketball, 40 offers to play football and 40 offers to run track.

Rick accepted a scholarship to play football at the University of South Carolina. He was the top recruit for new incoming coach Jim Carlen. He and Coach Carlen developed a special bond that exists to this day, and Rick says, "Coach Carlen is like a second father to me". (Please see Attachment A: Letter from Coach Jim Carlen)

Rick excelled in football at USC from 1975-1978. During his senior year, he was selected as a first team All-American Defensive Back by the Sporting News, the most prestigious All-American team selected by professional football scouts. Rick was also selected to play in the 1978 Senior Bowl All-Star game in Mobile, Alabama and the Shrine Bowl All-Star game in California. Rick says, "Few athletes have the opportunity to play in both high school and college Shrine Bowl All-Star games, and I was honored to have that privilege. My parents always taught me to help those who were less fortunate, and helping the children cared for at Shriners Hospital was important to me".

In 1979, the National Football League draft was conducted in early May. Rick's father, brother and uncle came to Columbia to be with Rick during the draft selection process. In those days, the draft was not covered by the media, and players had to wait by the telephone to learn whether or not they were selected. Rick's father came to Columbia to be with him during the wait. Rick was drafted as the 25th player in the first round, selected by the New England Patriots. Rick says, "I will never forget how proud my dad was of me that day". Rick remains the only first round draft pick in USC football history.

Rick then moved to Boston to begin a seven year career in the NFL. With his first NFL paycheck, Rick renovated his mother's kitchen in his childhood home. He has always enjoyed a close relationship with his mother, and still speaks to her on the telephone every day. During his second year as a player, he married Sherri Bandy, his college sweetheart from USC. His daughter Jaclyn was born in 1984, and he was a devoted father and husband to his young family. Rick spent 1979-1984 in Boston with the Patriots. In 1983, he was selected as an alternate to the Pro-Bowl after having a season with 133 tackles and 7 interceptions. He was also honored by the

official fan club of New England (1776 Club) with the "Unsung Hero" award for his selfless contributions off the field.

Though he was an excellent football player, he was also a committed community servant and enjoyed representing the Patriots' organization for charitable causes. During his six years playing for the Patriots, he enjoyed volunteering with the Massachusetts Special Olympics and the Boys Club of Boston on numerous occasions. He believed it was his duty to give back to his community and support those who were less fortunate.

Rick spent the last year of his professional football career with the Seattle Seahawks. His wife and daughter joined him, and they lived in a small apartment. Professional football was very demanding, both physically and emotionally, as there was constant pressure to perform and retain your starting position. During his years playing football, Rick suffered nine concussions, broken fingers and broke his nose four times. The wear and tear on his body was great, and he decided it was time for him to retire from the game he so loved.

Rick had constant back pain while playing football and had been helped tremendously by a Boston chiropractor. After retiring from football, Rick decided he wanted to help others as he had been helped. He moved with his wife and young daughter to Atlanta, Georgia and enrolled in Life Chiropractic College in 1986. He had saved his football earnings, and used that money to pay his tuition and support his family during the four years he was in school. In 1988, Sherri gave birth to their second child, daughter Kaley. Sherri suffered complications during the birth and spent four days following the delivery in a coma. Rick cared for his newborn daughter and toddler daughter, as he worried about the possibility of his wife not surviving.

Sherri eventually recovered, and the family moved to Tega Cay, South Carolina for one year. Rick commuted to Columbia daily to his chiropractic job. Eventually they settled in

Chapin, South Carolina, and Rick continued working as a chiropractor in Columbia. He was the sole provider in the family and a devoted father and husband. Their daughters were involved in dance and cheerleading competitions, and Rick supported them in all their activities. He wanted his daughters to have all the opportunities and "extras" that he had not had as a child. Family vacations were often spent traveling to the children's dance competitions across the country. In 1998, Sherri was diagnosed with breast cancer, and had a mastectomy and chemotherapy. Rick cared for her throughout her surgery and treatment, while still supporting the family and caring for their children.

Rick has been a chiropractor for 21 years and is an outstanding and caring doctor to his patients. He always looks for ways to help them return to normal health and functioning. Patients often remark on the positive and uplifting environment he and his staff provide. (Please see Attachment B: Letter from Melvin Martin) He believes showing a nurturing and kind spirit to his patients is just as vital to their healing as the chiropractic care he renders.

Rick and Sherri divorced in 2007, yet remained committed to co-parenting their daughters. Rick continues to support Sherri and his daughters financially. Indeed, Rick's financial support is crucial to their well-being.

### III.     SERVICE TO OTHERS

In addition to previous work with the Special Olympics and the Boys Club, Rick has served as a volunteer coach at Spring Valley High School while his college roommate, Quay Farr, was there as head coach. He also served as a volunteer football coach at Chapin High School when his daughters were in school there. He has served as a motivational speaker at numerous youth sports events and has also volunteered as a coach at youth football camps. Because of his football achievements, Rick has participated in numerous fundraising events for

the George Rogers Foundation, the Palmetto Health Foundation and other charitable foundations and causes.

## IV.     OFFENSE CONDUCT

As a result of the emotional stress and financial setbacks of his divorce, the declining economy, and business difficulties, Rick declared financial bankruptcy in February 2009. This period of Rick's life was extraordinarily chaotic and stressful. He became involved in a destructive relationship with a woman which negatively impacted his entire life. We cannot overstate this point. Rick's life during this time period can best be described as a train wreck. This woman, who had moved into Rick's home, would not leave. She destroyed personal property; she harassed Rick and others close to him. Ultimately, Rick had to obtain a restraining order against her. As he struggled to cope, Rick at times abandoned his responsibilities, including the responsibility to disclose information to the bankruptcy court. Specifically, Rick failed to disclose a condominium in which he had an ownership interest. This information is not submitted as an attempt to excuse Rick's conduct. He is pleading guilty because he is guilty. This court, however, should seriously consider the circumstances surrounding the offense and the state of Rick Sanford's life and his emotions at this time in his life.

Ultimately, Rick did make full disclosure, and the Bankruptcy trustee was able to sell Rick's interest and recover money that was paid to Rick's creditors. Further, as a result of Rick's failure to make timely disclosure of the asset, he voluntarily waived discharge of his debts. Basically, he received nothing from the bankruptcy because of his actions. He has already paid dearly for his conduct, and Rick truly regrets his actions and the shame he has brought on himself and his family.

In September 2010, Rick married Allison Clyburn. Allison has worked in healthcare marketing for over 20 years and is the mother of high school aged twins. The marriage has been a stabilizing force in Rick's life, and he has thrived as a husband and stepfather to her children. Rick says, "Allison has helped me handle my current situation both emotionally and financially. She has been an unbelievable support to me".

Despite, or perhaps because of, the unfortunate turn his life has taken, Rick believes his life's purpose is unfolding. He says, "I know my purpose is to help others who are at one of life's crossroads. I want to speak to church youth groups and youth sports teams about the importance of character and redemption. Though we all make mistakes, with grace we can redeem ourselves and continue living a life of honor and humility. There is no achievement…academic, athletic or career…that is more important than being a person of character".

## V.     VARIANCE

### A.  A variance is justified based on application of the § 3553(a) factors and the directive that a sentence be "sufficient but not greater than necessary".

The United States Sentencing Guidelines are now advisory, and the advisory guideline range is now but one of seven factors to weigh when formulating a sentence. *United States v. Booker*, 543 U.S. 220, 244 (2005); 18 U.S.C. § 3553. In *Booker*, the Supreme Court held that the mandatory manner in which the Guidelines required courts to impose sentencing enhancements based on facts found by the court, by a preponderance of the evidence, violated the Sixth Amendment to the Constitution. *Id.* The Supreme Court remedied the constitutional violation by severing two statutory provisions, 18 U.S.C. § 3553(b)(1) (requiring sentencing courts to impose a sentence within the applicable Guideline range), and 18 U.S.C. § 3742(e) (setting forth appellate standards of review for Guideline issues), thereby making the Guidelines advisory. *Booker*, 543 U.S. at 259. Although the Guidelines are no longer mandatory, *Booker* makes clear

that a sentencing court must still "consult [the] Guidelines and take them into account when sentencing." *Id.* At 264.

Since *Booker* was decided, the Fourth Circuit has instructed that a district court should first determine the appropriate sentencing range under the Guidelines, making all factual findings appropriate for that determination. *See United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005); *United States v. Green*, 436 F. 3d 449, 456 (4th Cir. 2006), *cert. denied*, 126 S.Ct. 2309 (2006); *United States v. Moreland*, 437 F.3d 424, 432 (4th Cir. 2006). Next, the district court must consider whether a sentence within that range serves the factors described in 18 U.S.C. § 3553(a), and if not, select a sentence – within the statutory limits – that does serve those factors. *Green*, 436 F.3d at 456. In doing so, the district court should first look to whether a departure is appropriate based on the Guidelines Manual or relevant case law. *United States v. Pyles*, 482 F.3d 282, 288 (4th Cir. 2007). "If the resulting departure range still does not serve the factors set forth in § 3553(a), the court may then elect to impose a non-guideline sentence (a 'variance sentence')." *Id.* If the sentence falls outside the Guidelines range, the court should explain its reasons pursuant to 18 U.S.C. § 3553(c)(2). *Green*, 436 F.3d at 456.

Most importantly, the court must consider the mandate of 18 U.S.C. § 3553(a), which states: "The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes [of punishment] set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). This is the so-called "parsimony provision", which requires district courts to impose the minimum, least restrictive punishment needed to satisfy the purposes of sentencing: just punishment, deterrence, protection of the public and rehabilitation of the defendant. Section 3553(a) is a "broad command to consider the nature and circumstances of the offense and the

9

history and characteristics of the defendant." *Gall v. United States*, 128 S.Ct. 586, 596 n.6 (2007).

The Supreme Court has discussed extensively the role of district judges in shaping just sentences given the inherent uniqueness of each defendant and their particular circumstances. "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes, mitigate, sometimes magnify, the crime and the punishment to ensue." *Id,* at 598 (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)). Additionally, *Koon* recognized that district judges are to be afforded great deference when forming befitting, individualized sentences. This deference "embodies the traditional exercise of discretion by a sentencing court which hinges upon the District Court's special competence… about the 'ordinariness' or 'unusualness' of a particular case." *Koon*, 518 U.S. at 98-99.

We respectfully ask this Court to exercise its discretion to vary from the Guidelines in this case because ample grounds exist under the specific, individualized circumstances of this case for a different sentence from that which would result from the guideline calculation. Specifically, we request that Rick Sanford be given a sentence of probation that includes a condition of 100 hours of community service. A sentence of incarceration is not necessary to achieve greater justice, deterrence or rehabilitation.

### B. <u>Specific consideration of § 3553(a) factors</u>

*18 U.S.C. § 3553(a)(1) - - History and Characteristics of the Defendant*

This subsection of factors is the broadest of all the factors. Since the Supreme Court made the guidelines advisory, district courts have noted that this statutory factor expressly allows the sentencing judge to consider a number of factors that are either discouraged or disallowed

under the guidelines. Age is an example of one of the factors that a sentencing court may now consider post-*Booker* and *Rita*. In *United States v. Nellum*, 2005 WL300073 (E.D. Ind. Feb 3, 2005) (unpublished) the district court found that, in view of a Sentencing Commission report finding that "[r]ecidivism rates decline consistently as age increases", the fact that the defendant was 57 years old was an important factor warranting a reduced sentence. In Sanford's case, the court should consider the fact that he is 54 years old, and he falls within the age-criteria for declining recidivism rates. At his age, a reduced sentence of probation is appropriate.

Much discussion was made earlier in this memorandum regarding Rick Sanford's life. Sanford achieved success as a self-made, hardworking man. He has been a pillar of emotional and financial support for his former wife, his two children and his mother. He has recently remarried, and, of course, his current wife depends upon his financial support. If he is incarcerated, they would lose this support. This would be particularly hard on Sanford's former wife who has health issues which have made employment difficult. (Please see Attachment C: Letter from Sherri Sanford)

Sanford's exceptional employment record and commitment to family support a variance from the Guidelines in this case. It is also important to consider Sanford's deep remorse for his conduct. He bears incredible shame for his actions. While he once made headlines for his athletic prowess, he now endures the shame of news articles regarding bankruptcy fraud. Here, the history and characteristics of the defendant make probation an appropriate sentence.

### *18 U.S.C. § 3553(a)(1) - - Nature and Circumstances of the Offense*

The nature and circumstances of this case are very straightforward. During a chaotic, stressful period of his life, Mr. Sanford was so overwhelmed by a dysfunctional, emotional relationship in which he was involved that he acted with poor judgment and, seemingly, at times,

with no consideration of his responsibilities. During this time period, he failed to disclose an asset to the bankruptcy court which should have been disclosed.

All criminal cases are serious, and certainly Rick Sanford acknowledges the significance of his illegal actions. For Rick Sanford, however, this is a first time, non-violent offense. U.S. Department of Justice officials have repeatedly stressed to Congress and the public that the toughest federal sentences are to be directed principally toward violent and repeat offenders.[1]

It is also important to note that Rick Sanford has been fully cooperative. Indeed, his actions arguably constitute extraordinary acceptance of responsibility. He cooperated fully with the bankruptcy court, and he waived discharge of his debts. As a result, Rick received no benefit from filing bankruptcy. He came out of bankruptcy with the same debts from which he sought protection when he chose the dire step of bankruptcy. The bankruptcy trustee was able to sell Rick's interest in the condominium, and thus Rick's creditors in the bankruptcy suffered no monetary loss as a result. Likewise, here, he did not put the government to the task of trying this case. The nature and circumstances of the offense and Rick's cooperation and efforts to amend his wrongdoing suggest that a probationary sentence is appropriate.

**18 U.S.C.A. § 3553(a)(2)(A) --** *The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense*

---

[1] *See, e.g.*, Testimony of Principal Deputy Attorney General William Mercer to Subcommittee on Crime, Terrorism, and Homeland Security of the Committee on the Judiciary, United States House of Representatives, at 14 (March 16, 2006) (explaining that tough federal sentences are properly not focused on "non-violent first-offenders); Testimony of Assistant Attorney General Christopher Wray to Subcommittee on Crime,  Terrorism, and Homeland Security of the Committee on the Judiciary, United States House of Representatives, at 8-9 (Feb. 10, 2005) (stressing that most federal prisoners "are in prison for violent crimes or had a prior criminal record before being incarcerated"); Letter to the Editor from Dan Bryant, Assistant Attorney General, WASH. POST, Dec. 24, 2005, at A25 (asserting that "[t]ough sentencing makes Americans safer by locking up repeat and violent offenders").

The sentence which we propose is probation. Probation is considered a substitute for incarceration under § 5F1.1. The *Gall* Court, in the context of upholding the district court's non-incarceration sentence, dispelled any suggestion that a sentence of probation with no incarceration was overly lenient. The Court stated:

> We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several conditions that substantially restrict their liberty. [Citations omitted] Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking.

*Gall v. United States*, 552 U.S. 38, 128 S. Ct. 586, 595-596, 169 L. Ed. 2d 445 (2007)

We respectfully submit that a sentence of probation with 100 hours of community service will constitute substantial punishment for Sanford and will serve as a forceful, tangible reminder to the community of the seriousness of the offense and the importance of the legal obligations Sanford ignored. A sentence of incarceration will not achieve greater justice, deterrence or rehabilitation. Rick has already been punished for his failure to make full disclosure to the bankruptcy court. Because of his misconduct, he waived discharge of his debts. He has also endured the shame of newspaper articles detailing his conduct. Rick understands that he brought this upon himself. But the punishment is no less severe for being self-inflicted. No need exists for the additional punishment of incarceration.

*18 U.S.C. § 3553(a)(2)(B) - - The need for the sentence imposed to afford adequate deterrence to criminal conduct*

We believe the immediately preceding observations address this statutory consideration. Moreover, the fact that Sanford has been publicly disgraced will serve as a deterrent to others. He is devastated by the criminal conviction and the harm it has caused his reputation among

13

family and friends. He also truly grieves the loss of the right to vote in future elections. Further, the agents' and prosecutors' vigorous enforcement of the bankruptcy laws serves to deter this type of conduct. *United States v. Gardellini*, 545 F.3d 1089 (D.C. Cir. 2008).

***18 U.S.C. § 3553(a)(2)(C) - - The need for the sentence imposed to protect the public from further crimes of the defendant***

We respectfully submit that there is no likelihood that Sanford will ever be involved in any other criminal conduct. Sanford poses no threat to the public, and he does not need incarceration to protect anyone from future crimes. A probationary sentence is warranted given that, prior to being charged, Sanford made amends for his conduct such that no financial loss resulted to the bankruptcy court.

***18 U.S.C. § 3553(a)(2)(D) - - The need for the sentence imposed to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner***

We respectfully submit that these factors are not pertinent in the sentencing of this particular 54 year old defendant.

***18 U.S.C. § 3553(a)(3) - - The kinds of sentences available***

This factor encourages the Court to consider sentencing options such as downward departures or other reduction of sentences. This Court has a number of sentencing options available, from probation to full incarceration. Here, a reduction of Sanford's sentence for the reasons stated above is certainly "reasonable" and therefore authorized under *Booker*. The sentence fully comports with the requirement that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in § 3553(a)(2)"

***18 U.S.C. § 3553(a)(4) - - The kinds of sentences and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines***

The sentencing range established for the applicable category of offense committed by the defendant as set forth in the guidelines is 10 to 16 months. This is the result of an offense level of 12 and a criminal history category of 1. Again, however, the Guidelines are not mandatory and, indeed, are not to be presumed reasonable. *Nelson v. United States*, 129 S. Ct. 890, 172 L. Ed. 2d 719 (2009). The Guidelines are just one of many factors this Court is directed to consider.

*18 U.S.C. § 3553(a)(5) - - Any pertinent policy statement issued by the Sentencing Commission*

U.S.S.G § 5H1.11 treats "military, civic, charitable, or public service; employment related contributions; and similar prior good works" as discouraged departure grounds. However, after *Booker*, this restriction is only advisory and does not preclude a below-guideline sentence that reflects the § 3553(a) factors.

Rick has worked hard all of his life. Rick's work ethic and gifted athleticism led to a career in football. When his football career ended, Rick took his savings and used the money to study to become a chiropractor. He worked hard in this area and eventually opened his own practice. Despite his recent legal problems, Rick is considered to be a very good chiropractor who works hard to provide excellent care to his patients. (Please see again Attachment B: Letter from Melvin Martin)

In addition to working hard, Rick has always given back to his community. He learned to do this as a student in high school when he first worked with sick children at Shriners Hospital. Later, he would actually be recognized as an "Unsung Hero" for his service off the field with organizations such as Special Olympics and Boys Club of America. Rick continued his service to the community after making Columbia his home, where he has served as a coach to numerous children and participated in many, many fundraising events. (Please see again Attachment A: Letter from Coach Jim Carlen)

15

While "good works" may be frowned upon as grounds for a departure, this Court, thankfully, may consider such deeds when sentencing a man. This Court should know the sum total of the man who stands for sentencing. Indeed, this Court must specifically consider the history and characteristics of the defendant. Rick Sanford has an outstanding record of employment and service to his community. These things say a lot about the man and whether he deserves a probationary sentence. Rick performed these good works long before he knew he would ever stand before a judge to be sentenced. Now that he does find himself before this Court, his good works should be considered, and Rick should be granted a probationary sentence with a condition of 100 hours community service. Rick has previously done volunteer work for Big Brothers Big Sisters of Greater Columbia. Rick would like to work with at risk athletes. Rick has been in touch with the organization in the last two weeks, and they will welcome him there to complete this condition of probation if the court in its discretion deems the community service appropriate.

*18 U.S.C. § 3553(a)(6) - - The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct*

A sentence below the guideline range would not create unwarranted disparity because it is supported by the <u>particular</u> facts of this case.

*18. U.S.C. § 3553(a)(7) - - The need to provide restitution*

The offense conduct in this case resulted in no financial loss and restitution is not applicable.

## **CONCLUSION**

For all the reasons mentioned above, we respectfully request that the Court sentence Sanford to a term of probation and make a finding that the sentence imposed is the minimum necessary to achieve the goals of sentencing based on all of the § 3553(a) factors present in the

case. While the Guidelines deserve consideration, they are not binding, and they do not block this Court from sentencing Sanford to an appropriately reduced sentence by way of a variance in order to assure a just result. A probationary sentence will be sufficient to address the need for punishment and deterrence. Such a sentence, combined with the lifetime shame of a felony conviction and such other standard conditions of probation as the law requires and the court deems appropriate, will be in the best interest of justice for the general public, the government, and defendant Rick Sanford and his family. The defendant is grateful for the Court's consideration of the above factors in fashioning a sentence that will allow Sanford to continue to support his family with his time and earning capacity.

                Respectfully submitted,

                s/ Sherri A. Lydon
                SHERRI A. LYDON (#1038)
                1529 Laurel Street
                Columbia, SC 29201
                (803) 753-1592

                s/ John M. Barton
                JOHN M. BARTON (#1226)
                1331 Laurel Street
                Columbia, SC 29201
                (803) 252-2596

                ATTORNEYS FOR THE DEFENDANT

Columbia, South Carolina
July 14, 2011